UNITED STATES of America, Appellee,

v.

**Fernando MONTILLA–RIVERA,**
**Defendant, Appellant.**

No. 96–1773.

United States Court of Appeals,
First Circuit.

Heard April 9, 1997.

Decided June 19, 1997.

---

Peter Diaz–Santiago, Bayamon, PR, for appellant.

José A. Quiles–Espinosa, Senior Litigation Counsel, San Juan, PR, with whom Guillermo Gil, United States Attorney and Antonio R. Bazán, Assistant United States Attorney, Hato Rey, PR, were on brief, for appellee.

Before BOUDIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

Three men have gone to prison as a result of the distribution of two kilograms of cocaine within one thousand feet of a school in Carolina, Puerto Rico. Two of the men are guilty, having pled so. The third, Fernando Montilla–Rivera ("Montilla"), asserts that he is innocent. He trusted his fate to a jury, and he was convicted of aiding and abetting the crime, in violation of 21 U.S.C.

§§ 841(a)(1) and 860(a), and 18 U.S.C. § 2. On appeal, Montilla argues that the government's evidence showed no more than that he was present during the sale, and that this "mere presence" is insufficient to support the verdict. He also argues that the trial judge erred in denying him a new trial when, a year after his conviction, Montilla presented affidavits from the other two men, each swearing that Montilla was innocent.

### I.

We recite the facts as the jury could have reasonably found them. *United States v. Andrade,* 94 F.3d 9, 10 (1st Cir.1996). On March 22, 1995, Eladio Valerio, a Drug Enforcement Agency confidential informant, made a phone call in search of drugs. He called Miguel Calderón–Salmiento ("Calderón"), who would later become a codefendant in this case. In a taped conversation, which was clearly about arranging a drug purchase, Calderón told the informant, "Come on down here to . . . to go over to the mechanic at 12." The informant explained that he could not "come on down" that day because the funds were not ready. There were several other taped conversations about the deal. At that time, the mechanic working at the mechanic's shop to which Calderón referred was Montilla.

A few days later, on March 24, 1995, the informant, wired and accompanied by DEA Agent Domingo Carrasquillo, did meet with Calderón. The informant and Calderón initially met at a service station, where Calderón invited the informant to go "see the mechanic." The informant understood that "by seeing the mechanic," Calderón meant they would go "where the material or the drug was." Agent Carrasquillo went ahead to a shopping center where he expected the drug transaction to take place.

Calderón drove the informant to an auto repair shop, behind the Metreza night club in San Antón, which was within one thousand feet of a public school. The shop was a wooden structure attached at one end to the club and open at the other. There was a small room inside the shop; the repair work took place outside of this room.

At the shop, the informant saw Ramón Zorrilla, who also later became a codefendant in this case, and Montilla. The informant shook hands with them, but did not speak to Montilla. Montilla wore overalls and had grease on his clothes; Zorrilla did not. The four men then went into the small room.

Once inside, the dealing began in earnest between the informant, Calderón, and Zorrilla. During these negotiations, Montilla was ten to twelve feet away, just inside the entrance to the room, "watching [and] looking." The informant and the other two negotiated and agreed on a price of $12,100 per kilogram of cocaine. As Montilla stood at the entrance, still watching, the three other men agreed that if the quality of the initial two kilograms was high, four more would be purchased. At that point, Zorrilla made a call from the room to have the cocaine delivered to the shop, requesting "two shoes." The informant called his "partner," in reality DEA Agent Carrasquillo, to arrange for the exchange of the cocaine for cash. While they waited for the delivery, and with Montilla still at the entrance, Calderón loudly commented on the quality of the cocaine: "[H]ell, pure cocaine." ("Diablo, cocaína pura.")

The drugs were delivered to the shop. As Montilla watched, the informant tasted the cocaine and pronounced that it was good and that the "deal was on." The informant went off with Calderón to the shopping center to meet the informant's partner, who had the money. Montilla and Zorrilla stayed behind with the cocaine at the shop.

At the shopping center, the partner showed Calderón the cash. The men agreed that Calderón would return alone to the repair shop, and that ten minutes later, the informant and his partner would bring the money for the exchange. Back at the shop, the "partner" agent told the informant to get out of the car, go into the mechanic's shop, and bring out the people involved in the transaction. The informant went into the small room, told Montilla, Zorrilla, and Calderón that "someone was waiting for them in the car, [and] for them to take the material and give them the money." Zorrilla and the informant approached the car and asked the partner to come into the shop, where they

would make the exchange. The partner refused and said the delivery should be made outside. Zorrilla complied and went back into the shop to get the drugs. The three men—Calderón, Zorrilla, and Montilla—came back toward the street, with Calderón carrying the drugs. Montilla and Zorrilla had moved to where they could watch the transaction from the front of the shop, about thirty feet away from the partner's car.

All three men were arrested where they stood when Calderón made the delivery. At the time of arrest, others were in the shop, including the shop owner and a visitor. At no time during the transaction did the informant see Montilla working on a car.

As the government conceded, its videotape of the drug delivery and arrest did not show Montilla; nor do any of the audiotapes of the transactions contain recordings of Montilla's voice. In fact, the government at trial described Montilla as a minor participant, but a knowing participant nonetheless, who had acted as a lookout.

Montilla's defense was mistaken identity, that Zorrilla was the "mechanic" referred to in the initial conversation. Zorrilla was a mechanic and had worked at this shop some four months earlier. Calderón was not a mechanic.

Montilla did not testify at trial. His first witness, the shop owner, testified that Montilla had worked for him there for about a month, that Zorrilla, not Montilla, lived in the room at the shop, and that Montilla had just been doing his job, repairing a car that was to be picked up that day. The owner also said that Zorrilla had worked for him at the shop for over a year, but had not worked there during the previous four months. The owner explained that just before Montilla went outside to the front of the shop where he was arrested, Montilla had said that he was stepping outside to have a soft drink and to smoke. Montilla's second witness, who was visiting the shop during the incident, testified that he had seen Montilla working on a car until he stepped outside to have a cigarette since the owner did not allow smoking inside the shop. The jury convicted Montilla, and he was sentenced to five years

in prison and eight years of supervised release.

Montilla originally planned to call both Zorrilla and Calderón as witnesses. The two entered guilty pleas on June 27, 1995. On June 29, 1995, Montilla filed a motion to have the Marshal's Service produce his codefendants to testify. The court granted the motion, but the two codefendants informed the court, on advice of and through their counsel, that they would not testify for Montilla. Montilla was convicted on July 1, 1995. Calderón and Zorrilla were not sentenced until September 26, 1995.

On July 17, 1996, Montilla filed a motion for a new trial under Fed.R.Crim.P. 33. The motion attached nearly identical affidavits from Zorrilla and Calderón. Zorrilla's affidavit said in relevant part:

> I never knew Mr. Fernando Montilla as qa [sic] drug dealer nor that he was or has been involved in drugs [sic] dealing but as a good har [sic] worker as a mechanic.

> I state that Mr. Fernando Montilla was not involve [sic] in the drugs [sic] transaction occurred on the date of my arrest and for which I pled guilty.

Calderón's affidavit stated in part:

> At no time, I have [sic] been aware that Mr. Fernando Montilla has been involved in any illegal activity like the one for which he was convicted, possession with intent to distribute cocaine. In other words, Mr. Fernando Montilla was not involve [sic] in the offense for which I pled guilty.

> At all time [sic] I knew Mr. Fernando Montilla as a hard mechanic worker and anything [sic] else.

Citing *United States v. Tibolt,* 72 F.3d 965 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996), the district court denied the new trial motion on the grounds that the witnesses were known and available at the time of trial. Thus, in the court's view, Montilla did not meet the requirements of Fed.R.Crim.P. 33.

## II.

### *Sufficiency of the Evidence*

In our sufficiency of the evidence review, we determine whether, drawing all reason-

able inferences in the government's favor, a rational jury could find guilt beyond a reasonable doubt. *Andrade*, 94 F.3d at 12.

■ Montilla argues that the jury was faced with two equally likely scenarios, one of which was that he was innocent. He asserts that under *United States v. Andujar*, 49 F.3d 16 (1st Cir.1995), this is insufficient to meet the government's burden of proof of guilt beyond a reasonable doubt. Montilla's statement of the law is correct. *Id.* at 22 ("When a jury is confronted ... with equally persuasive theories of guilt and innocence, it cannot rationally find guilt beyond a reasonable doubt."). However, Montilla understates the case against him.

The guilt of Zorrilla and Calderón is admitted. When Calderón and Zorrilla were negotiating the deal at the shop, Montilla was constantly present. Criminal conspirators do not often "welcome innocent nonparticipants as witnesses to their crimes." *United States v. Batista–Polanco*, 927 F.2d 14, 18 (1st Cir. 1991); *see also United States v. Cuevas–Esquivel*, 905 F.2d 510, 515 (1st Cir.1990). No effort was made to keep the illicit deal from Montilla's ears. Indeed, Zorrilla loudly bragged about the purity of the cocaine in front of Montilla.

■ Still, mere association with a principal or mere presence while criminal activity is going on around one is not enough to establish aiding and abetting, even when combined with knowledge that a crime will be committed. *See United States v. Luciano–Mosquera*, 63 F.3d 1142, 1150 (1st Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1879, 135 L.Ed.2d 174 (1996). As Montilla points out, this was a crime-ridden neighborhood and knowledge by Montilla that those around him were committing crimes does not necessarily mean that he was aiding and abetting those crimes.

■ While knowledge is certainly an element of the offense, *id.*, (and the facts here abundantly show knowledge), something

more, some action to assist the crimes, is needed. *See id.* To convict Montilla of aiding and abetting, the government had to prove that his codefendants committed the crime, and that Montilla associated himself with, and participated in the drug transaction as something he wished to bring about, and sought by his actions to make it succeed. *United States v. Ruiz*, 105 F.3d 1492, 1499 (1st Cir.1997).

■ The government says that the something more is that Montilla acted as a lookout. Several inferences from the evidence support the government's position. The first is that Montilla was at the entrance to the small room where he could act as a lookout while the drug deal negotiations were being conducted and was not in the shop repairing cars. The second is that, when the informant told the men it was time to deliver the drugs to his partner, all three men, including Montilla, left the small room to go out toward the car. The third is that Montilla, who did not have the drugs, stopped just outside the shop, and from that vantage watched. He was well-situated to act as a lookout, and an arresting agent thought that was exactly what Montilla was doing.

The evidence is thin, but not so thin as to invalidate the jury's reasonable assessment that Montilla is guilty.

*New Trial Motion*

■ The district court's denial of the motion for a new trial is reviewable only for a manifest abuse of discretion. *Andrade*, 94 F.3d at 14. A district court's power to order a new trial is greater than its power to grant a motion for acquittal. *Ruiz*, 105 F.3d at 1500.

■ Rule 33 of the Federal Rules of Criminal Procedure authorizes a district court to grant a new trial "if required in the interest of justice." [1] Where, as here, the motion is based on new or previously unavailable evidence, the defendant has to establish that "the evidence was: (i) unknown or un-

---

1. Fed.R.Crim.P. 33 states in relevant part:
 The court on a motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly discov-

 ered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case.

available at the time of trial, (ii) despite due diligence, (iii) material, and (iv) likely to result in an acquittal upon retrial." *Tibolt,* 72 F.3d at 971.

Although the new statements by the two principals of the drug transaction that Montilla is innocent appear facially to satisfy the third and fourth elements of the test,[2] our focus is on the first element of the test. The district court denied the motion on the ground that the evidence was both known and available. Similarly, the government, apparently conceding the third and fourth elements, argues that the testimony was neither unknown, nor unavailable. It also asserts that Montilla did not exercise due diligence.

In this lies the problem. Both the government's arguments and the district court's ruling assume that Zorrilla and Calderón were "available" to testify at Montilla's trial. But Montilla, who, it facially appears, had diligently attempted to secure their testimony,[3] did not have the power to compel them to testify at his trial in light of their Fifth Amendment privileges once they changed their minds about testifying.

Montilla's trial commenced on June 27, 1995. On that same day, Calderón and Zorrilla entered pleas of guilty and the court accepted their pleas. Their sentencing was deferred until September, 1995. Calderón's and Zorrilla's counsel each advised his client not to testify for Montilla because the testimony might incriminate them with regard to other transactions and because the men still had to face sentencing proceedings. Exercising their privilege against self-incrimination, Calderón and Zorrilla informed the court that they would not testify, and they were excused.

We have recognized that an unsentenced defendant who has pled guilty retains a legitimate protectable Fifth Amendment interest as to matters that could affect his sentence. *United States v. De La Cruz,* 996 F.2d 1307, 1312 (1st Cir.1993); *see United States v. Zirpolo,* 704 F.2d 23, 25 & n. 2 (1st Cir.1983); *see also Estelle v. Smith,* 451 U.S. 454, 461–63, 101 S.Ct. 1866, 1872–73, 68 L.Ed.2d 359 (1981) (state's efforts to compel criminal defendant to testify at sentencing phase of capital trial would contravene Fifth Amendment). Further, the potential importance of the presentence phase of criminal proceedings to a defendant is highlighted by Fed.R.Crim.P. 32(e) which expressly permits a defendant to withdraw a guilty plea before a sentence is imposed by showing "any fair and just reason." It was an error of law for the district court to hold that the testimony of these witnesses was available per se.

■ This then poses a legal question, not explicitly addressed by the government. Rule 33 permits new trial motions to be filed within two years only if the evidence is "newly discovered." If the evidence is not "newly discovered," and the motion was not filed within the seven days otherwise required, then the district court lacks jurisdiction to hear the motion. *United States v. DiSanto,* 86 F.3d 1238, 1250 n. 12 (1st Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1109, 137 L.Ed.2d 310 (1997).

■ The legal question is whether exculpatory affidavits from codefendants who did not testify at trial because they exercised their Fifth Amendment privileges may ever qualify as "newly discovered" evidence within the meaning of Rule 33. Most other circuits have expressed hostility to this notion, usually on the ground that the defendant was aware of the potential testimony at trial,

---

2. The statements are material and appear to give rise to a "reasonable" probability of acquittal upon retrial. *United States v. Sepulveda,* 15 F.3d 1216, 1220 (1st Cir.1993). In saying this, we are taking account of the ambiguity and thinness of the inculpatory evidence and are taking the exculpatory statements at face value. Whether the latter would retain their force after close examination is a different question; as we note below, a hearing might cast a different light on these statements.

3. According to Montilla's trial attorney's affidavit submitted in support of the motion for a new trial, he tried on two separate occasions to interview Zorrilla and Calderón, but they refused to give him any information. (The dates of these attempts are unclear). Despite not knowing the contents of their testimony, the trial attorney moved to have Zorrilla and Calderón subpoenaed to testify. His client Montilla insisted that the testimony would exculpate him rather than hurt him.

even if that testimony was unavailable due to assertions of privilege. These courts have held that such testimony is not newly discovered. *See, e.g., United States v. Theodosopoulos,* 48 F.3d 1438, 1448–50 (7th Cir.1995), *United States v. Muldrow,* 19 F.3d 1332, 1339 (10th Cir.1994); *United States v. Dale,* 991 F.2d 819, 838–39 (D.C.Cir.1993); *United States v. DiBernardo,* 880 F.2d 1216, 1224–25 (11th Cir.1989); *United States v. Metz,* 652 F.2d 478, 480–81 (5th Cir.1981), *United States v. Diggs,* 649 F.2d 731, 739–40 (9th Cir.1981).

We believe the question is resolved affirmatively by our precedent. This circuit has, for almost twenty years, held that the "newly discovered" language of Rule 33 encompasses evidence that was "unavailable." *See Vega Pelegrina v. United States,* 601 F.2d 18, 21 (1st Cir.1979). In this, our test has differed from that of other circuits, as the cases cited above demonstrate. Indeed, in *Vega Pelegrina,* the newly discovered evidence was the testimony of a codefendant who had refused to testify for defendant at trial, or to recant a prior inculpatory statement until the statute of limitations had run. *Id.*

This court has adhered to the four part test outlined in *United States v. Wright,* 625 F.2d 1017 (1st Cir.1980), for almost two decades, saying that the first question is whether the evidence "was unknown *or unavailable* to the defendant at time of trial." *Id.* at 1019 (emphasis added); *see, e.g., United States v. Ortiz,* 23 F.3d 21, 27 (1st Cir.1994); *United States v. Benavente Gomez,* 921 F.2d 378, 382 (1st Cir.1990); *United States v. Glantz,* 884 F.2d 1483, 1486 (1st Cir.1989); *United States v. Martin,* 815 F.2d 818, 824 (1st Cir.1987). This panel is not free, on its own, to alter circuit precedent absent some intervening reason such as a Supreme Court decision or new legislation.

Furthermore, given the "[i]n the interests of justice" standard of Fed.R.Crim.P. 33, there seems little distinction between evidence which a defendant could not present because he did not know of it and evidence which he could not present because the witness was unavailable despite exercising due diligence. At least in the context of newly available evidence from one not a codefend-

ant, at least two circuits appear to agree. *See United States v. Garland,* 991 F.2d 328, 335 (6th Cir.1993) (ordering new trial where "although the defense knew of [witness's] existence before and during the trial, [the witness] was not located until after the trial."); *United States v. Ouimette,* 798 F.2d 47, 51–52 (2d Cir.1986) (ordering hearing on new trial where witness, while known of at trial, was unavailable after police allegedly pressured him not to testify).

We believe the better rule is not to categorically exclude the testimony of a codefendant who asserted his Fifth Amendment privilege at trial under the first prong but to consider it, albeit with great skepticism, in the context of all prongs of our four part test. It is true that there is a greater need for caution in considering Rule 33 motions where the new evidence comes from a codefendant who was "unavailable" at trial because he chose to exercise his privilege. *See DiBernardo,* 880 F.2d at 1224; *United States v. Jacobs,* 475 F.2d 270, 286 n. 33 (2d Cir.1973). It is not unusual for the obviously guilty codefendant to try to assume the entire guilt. *United States v. Alejandro,* 527 F.2d 423, 428 (5th Cir.1976). A convicted, sentenced codefendant has little to lose (and perhaps something to gain) by such testimony. *United States v. Freeman,* 77 F.3d 812, 817 (5th Cir.1996). "Such testimony [by sentenced codefendants] would be untrustworthy and should not be encouraged." *United States v. Reyes–Alvarado,* 963 F.2d 1184, 1188 (9th Cir.1992).

Nonetheless, there is, here, at least a facial showing of compliance with the other prongs sufficient to warrant further inquiry. On its face, the proffered testimony in the affidavits is material, and the testimony, if believed, could lead to a different outcome, especially in light of the government's sufficient, but underwhelming, case against Montilla. *See Benavente Gomez,* 921 F.2d at 383 ("It is true that where the trial evidence was noticeably thin, new exculpatory evidence may be of increased importance."). The new testimony, while it may not be true, is not inherently implausible. And we note that Montilla has steadfastly maintained his innocence, even through sentencing, at some cost. Be-

cause he refused to acknowledge that he had committed a crime, Montilla was ineligible for sentence reductions for acceptance of responsibility under the U.S. Sentencing Guidelines.

 The term "on its face" is used deliberately here and with no suggestion that the codefendants' newly available testimony is true. That the codefendants waited a year to come forward hardly supports the strength of their assertions. But there is enough to commit the matter back to the district court, which is itself, under the law, responsible for weighing the factors under Rule 33:

> Motions for new trial are directed to the discretion of the trial court. In considering such a motion, the court has broad power to weigh the evidence and assess the credibility of both the witnesses who testified at trial and those whose testimony constitutes "new" evidence.

*Wright,* 625 F.2d at 1019. The judge may, of course, use the knowledge he gained from presiding at the trial, as well as the showing made in the motion. 3 Wright, *Federal Practice and Procedure* § 557, at 337 (2d ed.1982).

 We follow our precedent in *United States v. Abou–Saada,* 785 F.2d 1 (1st Cir. 1986), and remand to the district court to reconsider the motion for a new trial and to hear evidence. There is no suggestion that such hearings are required in the usual course; they are not. *Cf. United States v. Kearney,* 682 F.2d 214, 218 (D.C.Cir.1982). Had the district court itself ruled otherwise on the issue of unavailability, it might have chosen to have a hearing. We think it wiser here for the district court to hold such a hearing given the unusual combination of circumstances here. Montilla's conviction rests almost entirely on the testimony of the

DEA informant. Neither the videotape nor the audiotape directly incriminate Montilla. The reference on the audiotape to the mechanic could equally well be understood to refer to the location of the deal, and not to the role of the mechanic. Only the informant places him in the small room; Montilla's other witnesses say he was repairing a car. A hearing will be helpful[4] where the matters presented by the proffer are not "conclusively refuted as to the alleged facts by the files and records of the case." *United States v. Carbone,* 880 F.2d 1500, 1502 (1st Cir.1989) (internal quotation marks and citation omitted). The credibility of the witnesses is important. Neither Calderón nor Zorrilla testified before—this is not a recantation of testimony situation where the court has had an opportunity to assess credibility.[5]

We believe the district court should, after a hearing, reconsider whether, as Rule 33 provides, "the interests of justice require a new trial." *See Ouimette,* 753 F.2d at 192–93 (remanding to the district court for hearing on new trial motion where affidavit presented new testimony going to issue of defendant's guilt); *Lyles v. United States,* 272 F.2d 910, 913 (5th Cir.1959) (on new trial motion, district court "will be in a better position to exercise its functions" after holding hearing).

As already observed, we disagree with the decisions treating the belated statements of codefendants aimed at exculpating the moving defendant as per se insufficient under Rule 33. But we share the general skepticism concerning those statements, and the present opinion by no means confers any automatic right in such a case to a new trial or even to a hearing. Our judgment here turns on unusual circumstances including the weakness of the government's case against the defendant, significant efforts to procure the codefendants' testimony before his own

---

**4.** In different contexts, such as reported improper communications with jurors, hearings have been thought necessary before there is a ruling on a new trial motion. *Remmer v. United States,* 347 U.S. 227, 229–30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). Although different institutional interests are admittedly at stake, we have required a hearing be held on motions to withdraw guilty pleas, where affidavits raise substantial issues of whether the defendant is guilty. *United States v. Crooker,* 729 F.2d 889, 890 (1st

Cir.1984); *United States v. Fournier,* 594 F.2d 276, 279 (1st Cir.1979).

**5.** Some courts have concluded that affidavits from others recanting their earlier testimony may be deemed inherently not credible. *See, e.g., United States v. Leibowitz,* 919 F.2d 482, 483 (7th Cir.1990) (only partial hearing conducted on new trial motion).

conviction, and the plausible explanation as to why the evidence was not available earlier.

The case is *remanded* for proceedings consistent with this opinion.