UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


Nos. 96-1775
97-1400

UNITED STATES,
Appellee,

v.

MARK O. HENRY,
Defendant - Appellant.



APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge] 



Before

Selya and Boudin, Circuit Judges, 

and Dowd, Jr.,* Senior District Judge. 



Bjorn Lange, Assistant Federal Public Defender, Federal 
Defender Office, for appellant.
Jeffrey C. Dobbins, Attorney, Department of Justice, with 
whom Lois J. Schiffer, Assistant Attorney General, Environment 
and Natural Resources Division, Stephen R. Herm, Jeremy F. 
Korzenik and David C. Shilton, Attorneys, Department of Justice, 
were on brief for appellee.



February 5, 1998


AMENDED OPINION

 

* Of the Northern District of Ohio, sitting by designation.

DOWD, Senior District Judge.  DOWD, Senior District Judge. 

I. INTRODUCTION I. INTRODUCTION

The defendant-appellant Mark O. Henry (hereafter

"Henry") prosecutes two appeals growing out of his indictment and

conviction for one count of conspiracy to violate 42 U.S.C. 

6928(d)(l) which prohibits the transport of hazardous waste to a

facility that does not have a permit to receive such waste, one

count of mail fraud and three counts of wire fraud.

Henry owned and operated Cash Energy, a corporation

with offices in North Andover, Massachusetts. Cash Energy

operated numerous affiliated businesses, including Beede Waste

Oil ("Beede"), located primarily at Kelly Road in Plaistow, New

Hampshire. Henry directed the affairs of both Cash Energy and

Beede. Robert LaFlamme, an indicted co-conspirator who testified

against Henry, managed Beede and oversaw its day-to-day

operations.

Beede applied to the New Hampshire Department of

Environmental Services ("NHDES") in March 1990 for a permit to

recycle virgin petroleum contaminated soil into cold mix asphalt.

Virgin petroleum contaminated soil is soil contaminated with

petroleum or petroleum products, petroleum sludge, and all liquid

petroleum derived hydrocarbons, such as lubricating oil, heating

oil, gasoline, kerosene, and diesel fuel. However, the

definition excludes soil that is determined to be hazardous waste

because it is contaminated with other chemicals or metals. Beede

needed an NHDES permit because the recycling process emits air

-2-

pollutants. The recycling process required the use of a "pug

mill" to mix contaminated soil with gravel and asphalt emulsion.

Beede eventually obtained the permit in July. However, the

permit capped the amount of contaminated soil that could be

stored at the site at 3,000 tons.

Beede entered into recycling contracts with several

entities even before the permit was issued. Although the company

sporadically recycled soil using a leased pug mill, the amount of

contaminated soil stored at the site soon exceeded the permitted

amount. Eventually, the amount of unrecycled soil grew to as

much as 19,000 tons and at no time after May 1990 did Beede ever

have less than 3,000 tons of soil at the site. By April 1991,

Beede's failure to comply with the permit caused the New

Hampshire Air Resources Division to issue an administrative order

prohibiting Beede from accepting any more contaminated soil.

This order was superseded by a new permit issued in June 1991

that allowed Beede to begin receiving new soil only if it first

recycled all of the soil that had accumulated at the site.

Although Beede engaged in a small amount of soil recycling after

the June 1991 permit was issued, it continued to receive new

contaminated soil at the site in violation of the permit terms.

The mail and wire fraud counts charged that Henry

participated in a scheme to defraud several of Beede's customers

of money by falsely representing that Beede could lawfully

receive and recycle the customers' virgin petroleum contaminated

soil. The conspiracy count charged that Henry participated in a

-3-

conspiracy to knowingly cause hazardous waste to be transported

to a facility that was not permitted to receive such waste in

violation of 42 U.S.C. 6928(d)(1). The conspiracy charge

involved three overt acts.1

The grand jury returned a 17 count indictment against

Henry and LaFlamme on March 2, 1995 charging conspiracy, mail

fraud and wire fraud. Later, on January 5, 1996 a superceding

indictment was returned limiting the counts to a single count of

conspiracy, six counts of mail fraud and three counts of wire

fraud. LaFlamme pleaded guilty to one count of mail fraud and

the conspiracy count and subsequently testified for the

government at Henry's trial which was held over an eight day span

in February of 1996.

The first appeal challenges his convictions and the

resulting 37 month sentence; the second appeal contends that the

district court should not have denied his motion for a new trial

based on newly discovered evidence.

For the reasons that follow we affirm the convictions

and sentence and the denial of Henry's motion for a new trial.

II. THE CHALLENGED CONSPIRACY CONVICTION II. THE CHALLENGED CONSPIRACY CONVICTION

A. The Challenged Jury Instructions on the

Conspiracy Count.

 

1 Two of the overt acts charged that in the spring of 1991
Henry, after receiving laboratory data showing contamination of
the soils, either by cadmium or iron, caused the soils to be
transported to Beede. One shipment of 243 tons came from a site
in Lawrence, Massachusetts and the other shipment of 250 tons
came from the Portsmouth Naval Shipyard in Kittery, Maine.

-4-

The conspiracy count, charged under 18 U.S.C. 371,

alleged that Henry and LaFlamme conspired knowingly to

transport and cause to be transported hazardous waste to a

facility that did not have interim status and a permit to accept

hazardous waste in violation of 42 U.S.C. 6928 (d)(l).2

The indictment defined hazardous waste by reference to

the substances and materials listed or identified in Title 40,

Code of Federal Regulations, Part 261 and further alleged that

under the regulation, "any waste containing concentrations of

lead in excess of 5 parts per million or cadmium in excess of l

part per million using appropriate test methods is a hazardous

waste."

The jury instructions relative to the conspiracy charge

defined the offense of causing hazardous wastes to be transported

to an unpermitted facility as requiring the following elements:
 

2 Section 6928(d)(l) provides:

(d) Criminal penalties (d) Criminal penalties

Any person who--

(1) knowingly transports or causes to
be transported any hazardous waste
identified or listed under this
subchapter to a facility which does not
have a permit under this subchapter, . .
. 

. . . .

shall, upon conviction, be subject to a
fine of not more than $50,000 for each
day of violation, or imprisonment not to
exceed two years (five years in the case
of a violation of paragraph (1) or (2)),
or both. . . .

-5-

First, that the defendant transported or
caused to be transported hazardous waste to a
facility that was not authorized to receive
such waste; and 

Second, that the defendant knew that the
material transported was hazardous and that
the facility that received the waste was not
authorized to receive such waste.

Then, over the defendant's timely objection, the court

defined hazardous waste as follows:

Solid waste qualifies as hazardous waste if 
using the toxicity characteristic leaching 
procedure, TCLP, extract from a 
representative sample of the solid waste
contains lead in concentrations greater than
five parts per million or cadmium in
concentrations greater than one part per
million.

(Emphasis added). 

The appellant couples the challenge to the definition

of hazardous waste with the claim that the trial court improperly

participated in the direct examination of the government witness

Michael Wimsatt, a regulatory inspector with NHDES in the

hazardous waste program.

First, we observe that the court's definitional

instruction as to what constitutes hazardous waste was correct as

a matter of law. The government bears the burden of establishing

that the defendant knew that the materials transported 

constituted hazardous waste. The Congress has delegated to the

Administrator of the EPA the responsibility for listing the types

and characteristics of substances considered to be hazardous

wastes. 42 U.S.C. 6921(b). The ensuing regulation, found at

40 C.F.R. 261.3, provides that soil is a hazardous waste if it

-6-

"exhibits any of the characteristics of hazardous waste

identified in Subpart C." Subpart C includes the characteristic

of "toxicity". 40 C.F.R. 261.24 introduces the Toxicity

Characteristic Leaching Procedure (TCLP) as a means of testing

for toxicity and provides that when this testing procedure shows

that the waste contains any of the contaminants listed in table l

at a concentration equal to or greater than the respective value

given in the table, then the waste, by definition, constitutes

hazardous waste. The table located at 40 C.F.R. 261.24(a)

dictates that the regulatory limit for lead is 5 mg/L (or 5 parts

per million) and the corresponding regulatory limit for cadmium

is l mg/L (or l part per million). 

In the conference conducted by the district court prior

to finalizing the jury instructions, counsel for the defendant

argued that it should be left for the jury to determine if soils

shipped contained hazardous waste without the benefit of the

challenged definition. Defendant's counsel also disputed the

delegation by the Congress to the EPA Director to promulgate

regulations defining hazardous wastes and argued that because

there had been changes in those regulations as to what

constituted levels of toxicity, that an individual such as the

defendant should not suffer criminal liability in such a setting.

Defendant's argument is grounded in the nondelegation doctrine,

which provides that Congress may not delegate its legislative

power to another branch of the government. See U.S. Const. art. 

-7-

I, 1 ("All legislative powers herein granted shall be vested in

a Congress of the United States.").

The district court responded to the improper delegation

argument by reliance on Touby v. United States, 500 U.S. 160, 165 

(1991), for the proposition that the delegation of legislative

power to another branch of the government is permissible as long

as Congress sets forth an "intelligible principle" to which the

executive or judicial branch must conform. In Touby, the Supreme 

Court upheld Congress' delegation of the power to define criminal

conduct to the Attorney General as constitutionally permissible.

The Court held that "Congress does not violate the Constitution

merely because it legislates in broad terms, leaving a certain

degree of discretion to executive or judicial actors. So long as

Congress 'lay[s] down by legislative act an intelligible

principle to which the person or body authorized to [act] is

directed to conform, such legislative action is not a forbidden

delegation of legislative power.'" Touby, supra, at 165, quoting 

J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409, 48 

S. Ct. 38, 352, 72 L.Ed. 624 (1928).

The Touby Court then upheld the Controlled Substances 

Act at issue in that case on the ground that Congress had in fact

set forth an "intelligible principle" which meaningfully

constrained the Attorney General's discretion to define criminal

conduct. The Court discussed several factors that rendered the

statute constitutional: (1) requiring the Attorney General to

determine that the expedited procedure is "necessary to avoid an

-8-

imminent hazard to the public safety," (2) specifying the factors

that the Attorney General must consider in making such a

determination; and (3) requiring publication of a 30-day notice

of the proposed scheduling and consideration of any comments from

the Secretary of Health and Human Services. Touby, supra, at 166. 

We approve the district court's reliance on Touby in 

the instant case, and hold that the delegation by Congress to the

EPA of the legislative authority to define hazardous waste was

permissible given the fact that there existed several constraints

upon the EPA's exercise of this authority that are similar to the

constraints found to be determinative of constitutionality in

Touby. First of all, we note that the Resource Conservation and 

Recovery Act sets forth a detailed procedure with which the EPA

must comply before it may exercise this legislative power and

list the types and characteristics of hazardous waste.

Specifically, 42 U.S.C. 6921(a) requires the EPA to first

provide notice and the opportunity for public hearing on the

issue of what precisely are the characteristics of "hazardous

waste," and further requires the EPA to consult with "appropriate

Federal and State agencies" on this definitional issue. See 

Touby, supra, at 166 (delegation of legislative power to 

executive constitutional in part due to requirement that

executive consider comments from other authorities).

Secondly, in addition to requiring the EPA to comply

with these procedural steps, the statute specifies certain

factors that the EPA must consider in developing the criteria:

-9-

"the Administrator shall. . . develop and promulgate criteria for

identifying the characteristics of hazardous waste, . . . taking

into account toxicity, persistence, and degradability in nature,

potential for accumulation in tissue, and other related factors

such as flammability, corrosiveness, and other hazardous

characteristics." 42 U.S.C. 6921(a). See Touby, supra, at 166 

(holding specification of three factors that the executive is

"required to consider" constrains executive's legislative power

and renders delegation constitutional).

Furthermore, besides this detailed process for

establishing the criteria to be used in identifying hazardous

waste, the statute also constrains the EPA's discretion by

listing specific characteristics which the statute directs "shall

be subject to the provisions of this subchapter solely because of

the presence in such wastes of certain constituents (such as

identified carcinogens, mutagens, or teratagens) at levels in

excess of levels which endanger human health." 42 U.S.C. 

6921(b)(1).

In sum, we find no fault with the challenged

definition. In fact, the district court in this case was

sensitive to the knowledge component of the government's proof

and the defendant's contention that he believed the soils in

question did not constitute hazardous waste, and therefore

instructed the jury on a good faith defense.3
 

3 The jury was instructed as to the defense of good faith with
respect to the conspiracy count as follows:

-10-

B. The Questioning of Wimsatt by the District Court.

The defendant combined his objection to the definition

with an objection to the court's questioning of Michael Wimsatt,

a regulatory inspector with the NHDES in its hazardous waste

program. The court engaged in the following colloquy with

Wimsatt that featured the toxicity characteristic leaching

procedure:

THE COURT: And the TCLP test uses water as
the [leachate], right?
WIMSATT: It's a water solution. It has
some acid in it, obviously, and
it has whatever contaminants, but
it's still relatively dilute and
it's essentially a water
solution, that's right.
THE COURT: Is it fair to say, then, with a
TCLP test, something expressed as
five milligrams per liter, could
also be expressed as five parts
per million?
WIMSATT: Yes, that's correct, that's
right. So we have a limit set
under TCLP that says when you get
an extract from our sample, it
can't have more than five parts
per million of lead in it, and if
it does, it's going to be
considered a hazardous waste. 

 

If the defendant had a good faith belief
that Beede was authorized to transport the
waste to its facility, he is not guilty of
the crime of conspiracy even if it turns out
that that belief was wrong.

The burden of proving good faith does not
rest with the defendant because the defendant
does not have an obligation to prove anything
in this case. It is the government's burden
to prove beyond a reasonable doubt that the
defendant is guilty of conspiracy. 

-11-

The defendant's counsel first objected to the above

questioning of Wimsatt during the jury charge conference, and

when asked by the court what remedy did counsel propose, the

response was to delete the hazardous waste definitional paragraph

from the jury charge. The district judge declined, properly we

hold, and observed that he had the authority pursuant to Evidence

Rule 614 (b)4 to question witnesses and had done so to assist the

jurors. Specifically, the district court opined:

THE COURT: All right. I decline to do
that for the reasons that I've outlined. Let
me just note I think this issue of
questioning of witnesses by the Court is a
very important and - important matter that
has to be handled carefully by the Court.
Clearly, Rule 614(b) allows the Court to
question witnesses. In a trial like this
where I think much of the evidence has been
confusing and concerns technical matters,
terms that involve jargon, I think it is
important where counsel does not ask
questions clearly for the Court to clarify
undefined terms, and therefore I have asked
questions during the trial to that end.

I think it's also important for me since -
in order to protect the defendant's rights,
that I understand the import of something
that is being testified to. The jury has to
make findings of fact here ultimately in
deciding the defendant's guilt or innocence,
but I have to pass on motions that deal with
evidentiary sufficiency; such as, Rule 29
motions.

If I don't understand a particular point of
testimony, I can't do my job with respect to
a Rule 29 motion. So I feel it's important
for me to ask questions when I don't
understand some testimony and when the jury
may potentially not understand testimony. I
 

4 This rule states that "[t]he court may interrogate witnesses,
whether called by itself or by a party." Fed. R. Evid. 614(b).

-12-

try to do it as little as possible, and I try
my best not in any way to indicate in any
sense that I'm taking sides.

I also have in my jury instructions an
instruction to the jury that they should not
give any greater weight to the testimony of a
witness in answer to my questions simply
because the questions have come from me, and
I have reiterated for the jury the fact that
I am neutral, impartial and doesn't - don't
have a stake in this case, and I don't
believe that I've in any way adversely
affected the defendant's right to a fair
trial here by my questions.

So I think the premise of your request is
flawed, and I decline to grant the
instruction that you propose. 

Transcript of Day 8 at p. 41. 

We agree with the district court that his questioning

in this case was permissible. Initially, we note that the First

Circuit recognizes the "well-settled" rule that the trial judge

has a "perfect right" to participate in the trial and to question

witnesses. United States v. Gonz lez-Soberal, 109 F.2d 64, 72 

(1st Cir. 1997). The limitations placed on this right are that

the judge's questioning "must be balanced; he cannot become an

advocate or otherwise use his judicial powers to advantage or

disadvantage a party unfairly." Logue v. Dore, 103 F.3d 1040, 

1045 (1st Cir. 1997). "An inquiry into the judge's conduct of

the trial necessarily turns on the question of whether the

complaining party can show serious prejudice." Id. 

In the instant case, our review of the transcript

reveals that the judge's questioning of Wimsatt was nothing more

that the sort of occasional "efforts to clarify testimony" that

-13-

falls squarely within the scope of the district judge's right and

responsibility to manage the progress of the trial. See Logue, 

supra, at 1045. Furthermore, we hold that any possible risk of 

prejudice to Henry as a result of the judge's questions was

abated by the clear instruction to the jury that it should ignore

any impression that his questions might have made on them.

In conclusion, the trial transcript clearly

demonstrates that the key issue on the conspiracy count was

whether the defendant knew the soils constituted hazardous waste

and his good faith defense was anchored in his assertion that he

did not believe the soils constituted hazardous waste. We

further hold that the district court's decision to define

hazardous waste in the context of the indictment and the C.F.R.

regulations, rather than offer no assistance to the jury on the

question of what constitutes hazardous waste, as suggested by

defendant's counsel, was proper, and in any event, in the setting

of this case, clearly not prejudicial to the defendant.

III. THE SENTENCING ISSUES III. THE SENTENCING ISSUES

Two primary issues are raised. The court chose

U.S.S.G. 2F1.1 as the guideline to be followed, but the

defendant argued that U.S.S.G. 2Q1.2 was the better choice.5

The latter guideline governs such environmental offenses as the

 

5 Because the adjusted offense level for the conspiracy
conviction was determined to be nine levels less serious than the
level for the grouped fraud count, pursuant to U.S.S.G. 
3D1.4(c) the conspiracy conviction did not increase the total
offense level of 22 as computed under the mail and wire fraud
counts. 

-14-

unlawful transportation of hazardous materials and the

mishandling of hazardous or toxic substances. U.S.S.G. 2F1.1

deals with fraud and deceit, and the use of this guideline

resulted in a higher offense level calculation. A specific

offense characteristic under 2F1.1 requires a judicial

calculation of the loss caused by the fraud and deceit. Henry

challenges the court's calculation even though it was reduced one

level by the court from the pre-sentence recommendation.

The judge departed downward one offense level after he

concluded that the application of the Guidelines did not

"correctly capture [] the true value of the loss in this case."

The defendant was then sentenced to 37 months imprisonment, which

is the low end of the applicable range based on the defendant's

Criminal History of I.

A. Should the defendant have been sentenced under
Guideline 2Q1.2 rather than 2F1.1?

Appendix A to the Sentencing Guidelines Manual provides

a statutory index keyed to the applicable guideline. In the

introduction to Appendix A, the statement is made that "if, in an

atypical case, the Guideline section indicated for the statute of

conviction is inappropriate because of the particular conduct

involved, use the Guideline section most applicable to the Nature

of the Offense conduct charged in the count of which the

defendant was convicted." The reader is then referred to 1B1.2

of the Guidelines which states in Application Note 1 that "when a

particular statute proscribes a variety of conduct that might

constitute the subject of different offense guidelines, the court

-15-

will determine which Guideline section applies based upon the

nature of the offense conduct charged in the count of which the

defendant was convicted." Building on the atypical case

reference and Application Note 1 to 1B1.2, Henry contends that

his convictions represent an atypical fraud prosecution because

the gravamen of the convicted counts, including the conspiracy,

was that the defendant violated environmental rules and

regulations by transporting and storing contaminated soil which

exceeded permitted levels in quantity and composition at the

Beede Waste Oil facility in New Hampshire. 

The defendant suggests that the apparent dearth of

cases involving simultaneous federal prosecution of both

environmental offenses and wire and fraud counts suggests the

claimed atypicality and argues that the commentary in application

note 13 to U.S.S.G 2F1.1, which directs that "where the

indictment...establishes an offense more aptly covered by another

guideline, apply that guideline rather than 2F1.1," requires

that U.S.S.G. 2Q1.2 should have been followed by the district

court. The district court conducted a four hour sentencing

hearing and rejected the defendant's 2Q1.2 argument, holding

that the case was not about environmental crime, but rather "an

effort by Mr. Henry to generate income." We review de novo the 

trial court's determinations on the issue of whether to apply 

2F1.1 rather than 2Q1.2. United States v. Ruiz, l05 F.3d 1492, 

l504 (1st Cir. 1997). 

-16-

The defendant's reliance on United States v. Fulbright, 

105 F.3d 443 (9th Cir. 1996) is misplaced. In Fulbright, the 

defendant was convicted of conspiracy to impede federal officers

in violation of 18 U.S.C. 372 and for obstruction of justice

under 18 U.S.C. 1503. The district court there used the only

guideline listed for 18 U.S.C. in the Statutory Index to the

Guidelines Manual. Citing the atypicality language in Appendix

A,6 the Ninth Circuit then remanded for resentencing under

U.S.S.G 2A2.4 which is captioned "Obstructing or Impeding

Officers," because the defendant's conduct was determined to be

more analogous to impeding a federal officer than to obstruction

of justice. Id. at 453.  

In this case, in contrast to Fulbright, and as 

recognized by the district court below, the defendant's conduct

involved two classes of victims. With respect to the fraud

counts, the victims were the companies to which Henry made

promises that he never kept in exchange for the monies he

extracted, while the conspiracy conviction victimized society as

a whole. The decision in United States v. Rubin, 999 F.2d 194 

(7th Cir. 1993), tracks the single victim analysis as the victims

in connection with the mail fraud and price-fixing were the

same. Accepting the separate victim analysis and applying the

 

6 "If, in an atypical case, the guideline section indicated for
the statute of conviction is inappropriate because of the
particular conduct involved, [the court should] use the guideline
section most applicable to the nature of the offense conduct
charged in the count of which the defendant was convicted."
U.S.S.G. Appendix A. See also U.S.S.G. 1B1.2, comment (n.1). 

-17-

appropriate standard of review, we find no error in the

determination that the principal crime came under the fraud

analysis of U.S.S.G. 2F1.1. We find no fault in the district

court's analysis that the main motivation for the criminal

conduct was to obtain money. There is no indication that the

defendant was embarked on a crusade to engage in committing

environmental crimes. Rather, it is clear that his objective was

to make money, and in the process he engaged in an environmental

crime, which conduct was an incidental by-product of his

fraudulent conduct. We therefore find no error in the

application of the guidelines under the aegis of 2F1.1.

B. The Loss Calculation under U.S.S.G. 2F1.1.

The computation of the Offense Level under 2F1.1

requires a determination of the loss. A sliding scale has been

adopted in 2F1.1(b)(1). The presentence report fixed the loss

at $1,282,718, which required an addition of eleven levels. The

court refused to consider the Mobil Oil soil transactions, which

were the subject of count one, and deducted $740,642 from the

loss figure with a resulting total loss figure of $542,076. That

final calculation of the loss added ten levels to the loss.

Henry suggested that the remediation costs, while exceeding

$200,000 were less than the next dollar figure of $350,000 on the

sliding scale, and inferentially argued that the loss addition

should be computed at an increase of eight levels, rather than

the ten levels fixed by the court. United States v. Kelley, 76 

F.3d 436, 439 (1st Cir. 1996), teaches that a sentencing court's

-18-

valuation of loss is subject to the clearly erroneous standard.

Given the reality that some of the Beede customers may face

additional costs in the remediation context, the "benefit" to the

defrauded customers arising from the transportation of the soils

from their sites is at best speculative. We find no fault in the

ignoring of that possible benefit in the calculation.

Application Note 8 to 2F1.1 teaches that the (b)(1) loss need

not be determined with precision, but rather that the court need

only make a reasonable estimate of the loss given the available

information. Finally, we note that the district court departed

downward one level due to its uncertainty as to whether the loss

had been properly determined. We find no prejudicial error in

ignoring the "benefit."

The defendant also complains that the district court

improperly shifted the burden of demonstrating the value of the

services provided to the Beede customers to the defendant. In

view of the fact that the district court departed one level to

accommodate the "loss" issue,7 it is not necessary to address the

 

7 The district court, in granting the one-level downward
departure, explained that had he accepted Henry's argument that
the loss level should be reduced by the "benefit" claimed by
Henry, the resulting enhancement required by U.S.S.G. 
2F1.1(b)(1) would have been eight rather than ten levels. The
district court further explained that had the loss level been
calculated at eight levels, then the grouping rules for multiple
counts, U.S.S.G. 3D1.1, et. seq., would have come into play
with the consequence that the total offense level would have been
reduced only one level, i.e., from 22 to 21. In recognition of
the controversy over the calculation of the loss, the court then
departed downward one level from the total offense level of 22
that included ten levels for the loss to a total offense level of
21. See transcript of sentencing hearing at 153-156. 

-19-

final sentencing issue raised by Henry challenging the district

court's holding that the defendant had the burden of proof as to

the benefit provided the defrauded victims. In any event, we see

no error on these facts. 

-20-

IV. ALLEGED ERRORS IN THE CONDUCT OF THE TRIAL IV. ALLEGED ERRORS IN THE CONDUCT OF THE TRIAL

A. Questioning of Witnesses by the District Court.

The defendant objects to the questioning by the court

of the co-defendant LaFlamme and Michael Wimsatt.8 The defendant

points to the fact that the district court questioned LaFlamme

about the presence and use of the pug mill on the site, the fact

that soil had not been recycled even though Beede had produced

manifests to the contrary and the role of Beede in the production

and mailing of manifests. The fact questions in this case were

not within the every day experience of jurors such as they are in

the case of an automobile accident nor did it involve a subject

such as homicide, rape or robbery that are unfortunately

commonplace in our society. Against that background, it is

appropriate to again emphasize the previously discussed "well

settled" rule that a trial judge has a "perfect right" to

participate in the trial and to question witnesses. United 

States v. Gonz lez-Soberal, 109 F.3d 64, 72 (1st Cir. 1997). We 

therefore view the district court's questioning of LaFlamme, in

the context of this case, as a judicial effort to assist the jury

in a comprehensive and balanced understanding of relevant facts

in a complicated setting and within the permission acknowledged

by Fed. R. Evid. 614(b). We find no error.

 

8 The challenged questioning of Wimsatt has been addressed
previously and we see no need to revisit the issue. See supra 
discussion at 11-14.

-21-

B. The Refusal of the District Court to Exclude the
Testimony of Matthew Kelly.

The court issued a sequestration order as to the

witnesses and despite that order, the government witness, Matthew

Kelly was present for approximately 15 minutes of the testimony

of the co-defendant and cooperating witness, Robert LaFlamme.

Before allowing Kelly to testify, the trial court engaged in a

voir dire of Kelly and then concluded that Kelly could testify. 

We find neither an abuse of discretion nor prejudice to the

defendant in that the defendant was acquitted on the count to

which LaFlamme's testimony was directed while Kelly was present.

See United States v. Sep lveda, 15 F.3d 1161, 1177 (1st Cir. 

1993) and United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir. 

1983).

V. ISSUES RAISED BY THE DEFENDANT IN HIS PRO SE BRIEF V. ISSUES RAISED BY THE DEFENDANT IN HIS PRO SE BRIEF 

A. Was the defendant impermissibly convicted?

The defendant filed a separate brief with this court

and argues that the United States Code is not "real" law, and

also that he was impermissibly convicted of a violation of the

wire fraud statute, 18 U.S.C. 1343 because the legislative

history does not explicitly anticipate that telephones and

facsimile machines could serve as a basis for a violation of the

statute. We find no merit in either argument.

VI. THE DENIAL OF THE DEFENDANT'S MOTION FOR A NEW VI. THE DENIAL OF THE DEFENDANT'S MOTION FOR A NEW
TRIAL BASED ON NEWLY DISCOVERED EVIDENCE TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

The defendant filed a motion for a new trial two weeks

before his sentencing. The court went forward with the

-22-

sentencing on June 25, 1996, and then heard the motion on July

24, 1996 and overruled the motion on March 13, 1997. The

defendant then appealed the denial. This court then combined the

two appeals for a single appellate argument.

Recognizing that the standard of review is a "manifest

abuse of discretion" as set forth in United States v. Montilla- 

Rivera, 115 F.3d 1060, 1064 (1st Cir. 1982), citing United States 

v. Andrade, 94 F.3d 9, 14 (1st Cir. 1996), the defendant argues 

that the denial of the motion based on newly discovered evidence

was such an abuse of discretion. 

The motion for a new trial based on newly discovered

evidence was accompanied by a number of exhibits and affidavits

in support of the motion. The main thrust of the materials was

anchored in the proposition that had the evidence been presented

to the jury, the jury would more likely have believed the defense

that Henry did not believe the soils constituted hazardous waste

and that he did intend to remediate the soils. The judge

conducted a lengthy hearing in which he invited discussion on

each of the exhibits and affidavits from counsel and then denied

the motion in a carefully crafted 26 page order. 

A motion for a new trial based on newly discovered

evidence, to be successful, faces a difficult test. The defendant

must demonstrate that the evidence was unknown or unavailable at

the time of trial despite due diligence and that the evidence was

material and likely to result in an acquittal upon retrial.

United States v. Tibolt, 72 F.3d 965, 971 (1st Cir. 1995). 

-23-

The district court found that much of the evidence

could have been discovered with due diligence. In that context,

we note that the initial indictment was returned on March 2, 1995

and the superceding indictment was filed on January 5, 1996. The

trial began on February 6, 1996. Henry and his counsel, whose

defense of Henry appears to have been thorough and intense, had

nearly a year to prepare for the trial.9 We see no basis to

disturb the district court's denial of the motion as it related

to the evidence that could have been discovered prior to trial in

light of our teachings that an order denying a motion for a new

trial will not be reversed except where we find a "manifest abuse

of discretion." United States v. Montilla-Rivera, 115 F.3d 1060, 

1064 (1st Cir. 1997). 

Henry did offer a March 28, 1996 report that was

clearly new evidence in that the report was not available prior

to that time. Sanborn, Head & Associates, a consultant for the

State of New Hampshire, released a report assessing various

remedial alternatives for the contaminated soil remaining at the

Beede site. That report, in an appendix, contained copies of

test results conducted by Beede's laboratory that used the 3040

test method. Henry contends that the SHA report was important

new evidence as it demonstrated reliance by the State's

environment consultant on the same 3040 test method that Henry

claimed he had relied on in concluding that the soil removed from
 

9 Henry was represented by Bjorn R. Lange, an Assistant Federal
Defender, who was appointed on March 9, 1995 and remained as
Henry's counsel throughout the trial and on appeal. 

-24-

the Stoneham Laundry site was nonhazardous. The judge

acknowledged that the report was new evidence, but concluded it

was impeaching and cumulative and not sufficiently probative to

warrant a new trial. In reaching that conclusion, the district

court opined:

Henry has submitted no direct evidence to
support his claim that either NHDES [New
Hampshire Department of Environmental Safety]
or SHA [Sanborn, Head & Associates] relied on
the 3040 test results included in the SHA
report. Thus, I am asked to infer this
reliance from the bare inclusion of the
documents in the appendix of the SHA report.

The SHA report itself sheds little light on
the extent of SHA's reliance on the 3040 test
results. These test results were all
produced by Beede's own laboratory. SHA
included these analyticals in Appendix C of
its report. Appendix C is referenced on
pages 3-4 of the SHA report under the heading
"Soil Pile Descriptions" which states:
"Analytical results provided by NHDES for
soil collected from piles Nos. 5A, 53, 8 and
10 are included in Appendix C." Appendix C
itself consists mainly of numerous test
results from Chem Test Lab, apparently
ordered by NHDES. In addition to the Chem
Test results, there are four test results
produced by Beede's laboratory which analyze
halogens using the 9020 method, TPH using the
GCFID method, and metals levels using the
3040 method. Although these test reports are
included in Appendix C, it is unclear to what
extent, if any, they were relied upon by SHA.
Henry's contention, therefore, that the state
relied on his 3040 test analyticals in its
assessment of the Beede site's contamination
is, at best, uncertain.

Even assuming Henry could show that the
state relied on Beede's 3040 test analyticals
through the SHA report, Henry cannot show
that this new evidence is material. Henry
bases his argument that the SHA report
justifies a new trial mainly on the grounds
that it would have assisted him in his

-25-

impeachment of the testimony of Michael
Wimsatt. This new impeachment evidence is
not probative enough to suffice as grounds
for a new trial. See Pelegrina v. United 
States, 601 F.2d 18, 21 (1st Cir. 1979) 
("impeaching evidence is generally treated as
immaterial" on motion for new trial).

Finally, even if the SHA report
demonstrated that the state relied on the
3040 test and that Henry may also have been
justified in relying upon it himself, I
cannot conclude that the jury would likely
have acquitted Henry if it had been presented
with this new evidence. At trial, the
government's evidence was not just that Henry
mistakenly used the 3040 test as opposed to
the TCLP test, but that Henry was provided
with TCLP test results showing the soil he
was about to transport was hazardous. The
likely inference from these facts is that
Henry used the 3040 test to convince his
customers that the soil was not hazardous and
could be accepted at the Beede facility. All
these machinations were performed as a part
of a scheme whereby Henry agreed to transport
soil from New Jersey to a hazardous waste
facility in Michigan, but actually had no
intention of doing so. Instead, he
transported the soil to the Beede facility,
dumped it there and then performed the 3040 
tests. Henry showed these new test results
to his customer in an attempt to convince it
that the soil was acceptable for recycling at
the Beede facility. Henry's effort to show
that he might have reasonably relied on the
3040 test results is unlikely to overcome
this evidence of willful deceit. 

Appendix at pp. 18-21.

Our standard of review is anchored in an acknowledgment

that the judge who tried the case is best equipped to examine the

issue of whether the new evidence would likely result in an

acquittal. In our view, the district court, consistent with his

deliberate and thoughtful management of this case, carefully

-26-

analyzed the impact of the Sanborn, Head & Associates report and

we see no basis for disturbing his findings. 

For the reasons discussed, we affirm the defendant's

conviction and sentence, and we also affirm the district court's

denial of the defendant's post-trial motion for a new trial.

AFFIRMED. AFFIRMED

-27-