# United States Court of Appeals
## For the First Circuit

Nos. 17-1052
    17-1053

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ LAUREANO-SALGADO, a/k/a Geo;
PEDRO L. RAMÍREZ-RIVERA, a/k/a Peter Pai,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. William E. Smith, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Carlos M. Sánchez La Costa for appellant José Laureano-Salgado.
Irma R. Valldejuli for appellant Pedro L. Ramírez-Rivera.
Victor O. Acevedo-Hernández, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Francisco A. Besosa-

Martínez, Assistant United States Attorney, were on brief, for appellee.

————————————

August 2, 2019

————————————

**THOMPSON**, <u>Circuit Judge</u>.

## Overview

The government charged "La ONU" gangbangers José Laureano-Salgado and Pedro Ramírez-Rivera (sometimes collectively called "appellants") with helping murder a "La Rompe ONU" gangbanger nicknamed "Pekeke" (real name Christian Toledo-Sánchez), among other crimes[1] — thus violating the Violent Crimes in Aid of Racketeering ("VICAR") statute, <u>see</u> 18 U.S.C. § 1959(a)(1), as well as a statute banning the use or carry of a firearm in relation to a crime of violence, <u>see</u> 18 U.S.C. § 924(c)(1)(A).[2] Killing La Rompe members, the government alleged and proved, was central to La ONU's mission. And vice versa.

A jury ultimately convicted Laureano-Salgado and Ramírez-Rivera of these and other gang-related crimes. And we affirmed. <u>See</u> <u>Ramírez-Rivera</u>, 800 F.3d at 12. Laureano-Salgado and Ramírez-Rivera later moved the district judge for a new trial

---

[1] A gangbanger (at the risk of appearing pedantic) is "a member of a violent group of young men, especially ones who use guns and commit crimes." <u>See</u> *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/gangbanger (last visited August 1, 2019).

[2] We mention these convictions because those are the ones germane to today's case. Readers seeking more details about their other convictions can find them in <u>United States</u> v. <u>Ramírez-Rivera</u>, 800 F.3d 1 (1st Cir. 2015), which also provides some background on the two rival gangs. And like we did there, going forward we will refer to La Rompe ONU as "La Rompe."

premised on allegations of newly-discovered evidence that supposedly showed Pekeke died at the hands of La Rompe, not La ONU.[3]  The judge denied the motion, however.  Unhappy with this ruling, Laureano-Salgado and Ramírez-Rivera ask us to reverse.[4]  Unpersuaded by their arguments (discussed in a bit), we affirm.

### Testimony at Appellants' Trial About Pekeke's Murder

Among the witnesses called at appellants' trial were three cooperating coconspirators:  ex-La ONU members Wesley Figueroa-Cancel, José Gutiérrez-Santana, and Christian Figueroa-Viera.  Pieced together, their testimony presented the following picture of the events leading to Pekeke's death.[5]

Figueroa-Cancel, Gutiérrez-Santana, and Laureano-Salgado attended a meeting in August 2010 where La ONU bosses planned Pekeke's murder.  Their plot contemplated that a man named "Joshua" would do the deed (Joshua was a non-La ONU member whose grandmother lived right next door to Pekeke).  La ONU members — including Ramírez-Rivera (who participated by speakerphone during

---

[3] Laureano-Salgado filed for a new trial first.  Ramírez-Rivera then filed a motion joining and adopting Laureano-Salgado's motion and arguments — a motion the judge granted.  But because they raised the same basic claims, we follow the government's lead and treat the two filings as a single new-trial motion.

[4] They filed separate appeals.  But we consolidated them for purposes of oral argument only (they submitted separate briefs).

[5] The record reflects various spellings of Pekeke.  For simplicity's sake, we use the one used in the parties' briefs.

the meeting) — promised to pay Joshua for his service. Following the orders of their La ONU superiors to a T, Gutiérrez-Santana gave Joshua a gun and Laureano-Salgado gave Joshua a car. La ONU leaders also promised to send a rescue team to get Joshua out of the housing project after he offed Pekeke, just in case Pekeke's La Rompe allies fought back.

Joshua killed Pekeke the next day (Joshua called Figueroa-Cancel on a cellphone during the killing so Figueroa-Cancel could hear Pekeke die) — with Laureano-Salgado, Ramírez-Rivera, Gutiérrez-Santana, and at least two other La ONU members serving on the rescue squad. At a meeting held right after the shooting, La ONU associates — including Laureano-Salgado and Ramírez-Rivera — told Figueroa-Viera what had happened.

### Appellants' Motion for New Trial And the Judge's Ruling

Fast-forward to after we affirmed Laureano-Salgado's and Ramírez-Rivera's convictions and sentences. Defense counsel wrote the government, saying that he had heard that ex-La Rompe members Luis Yanyoré-Pizarro and Oscar Calviño-Acevedo testified in proceedings against La Rompe associates that La Rompe had killed Pekeke as part of a power struggle within La Rompe. Convinced that this testimony undercut the theory pushed by prosecutors in Laureano-Salgado and Ramírez-Rivera's case — *i.e.*, that *La ONU* had murdered La Rompe-leader Pekeke as part of the *La ONU* racketeering

conspiracy — counsel asked the government to turn over materials "regarding" Yanyoré-Pizarro's and Calviño-Acevedo's allegations. Despite disputing any notion that these allegations exculpated the defendants, the government gave counsel a package containing the documents in its possession.

Laureano-Salgado and Ramírez-Rivera then asked the judge for a new trial, claiming that the produced materials constituted newly-discovered evidence showing La Rompe had murdered Pekeke, not La ONU. And their court filings walked the judge through the relevant statements: Yanyoré-Pizarro's grand-jury testimony in May 2015, his interviews with agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (usually referred to as "ATF") in January 2016, and his trial testimony in October 2016; plus Calviño-Acevedo's trial testimony in December 2015 — all given in a case against La Rompe members.[6]

We just hit the highlights, offering only what is needed to help put some of the arguments (discussed later) into perspective.

---

[6] "Trials," of course, "are about charges in the indictment." United States v. Miller, 91 F.3d 1160, 1163 (8th Cir. 1996) (Richard S. Arnold, C.J.). And the indictment in the La Rompe case did not charge any La Rompe members with the VICAR murder of Pekeke.

During questioning about La Rompe's inner workings before the grand jury, Yanyoré-Pizarro recounted his relationship with La Rompe members "Trenza" and "Papito Mojica." "They were my leaders when they killed [Pekeke]," Yanyoré-Pizarro said. Pekeke "was our leader, so they kept the — so they took over." Yanyoré-Pizarro added that, although they remained with La Rompe, Pekeke's death triggered an internal war for power. "What happened," he said, "was when my leader, [Pekeke], was killed, there were people involved from . . . La Rompe . . . itself because of this very same — for power," and "they ended up dividing up" Pekeke's drug points. After Pekeke's death, Trenza, according to Yanyoré-Pizarro, became "in charge of around fourteen drug points, which is what [Pekeke] left."

In the interview with the ATF, Yanyoré-Pizarro mentioned some tension between La Rompe leaders in the months before Pekeke's death. For example, Yanyoré-Pizarro discussed how some La Rompe bosses at the La Rompe-controlled housing project in Alturas de Cupey had asked Pekeke "for help" with their drug business (because he had ties to marijuana traffickers on the mainland, apparently). But Pekeke had refused their request. Yanyoré-Pizarro also mentioned a conversation he had had with a La Rompe member named "Endrick." Endrick said that he told a La Rompe member named "Frank" that Pekeke was the "boss" — a statement that caused Frank

to slap Endrick's face.  Pekeke later told Yanyoré-Pizarro that he told Frank to apologize to Endrick because Endrick was right about who the "boss" was.  But Frank just looked at him and left.

More, Yanyoré-Pizarro disclosed to ATF agents that Joshua was from the Luis Llorén Torres housing project and that Pekeke had supplied "the vehicles and the firearms" used to kill "Shaka," a drug-point leader there.  Joshua "used to hang out with Endrick," though Endrick swore Joshua "was not part of the rival gang."

More still, Yanyoré-Pizarro admitted that although he was not there when Pekeke died, he later spoke to someone named "Pipen" who was.  And Pipen fingered Joshua — who lived with his [Joshua's] grandmother in the same housing project as Pekeke — as the killer.  Pipen also said that when Pekeke's cousin wanted a piece of the profits from Pekeke's old drug points, Pipen warned him "to stop talking in a threatening manner" or else "something could happen to him like what happened to [Pekeke]."

Called by the government at a La Rompe trial, Yanyoré-Pizarro testified (in response to questions from the prosecution about how he got involved with La Rompe) that when Pekeke moved to the Los Lirios housing project and became "the head honcho," he (Yanyoré-Pizarro) started running Pekeke's drug points, committing

robberies, and killing people.[7]  But when Pekeke "was killed," Yanyoré-Pizarro fled from Los Lirios because Pekeke's men thought Yanyoré-Pizarro had flipped and had helped kill Pekeke.  Asked to discuss his killing people for La Rompe, Yanyoré-Pizarro said "that we were at war with an opposing group, and we also had internal wars."

Testifying as a government witness at a different La Rompe trial, Calviño-Acevedo noted (in response to questions from the prosecution about why he stopped going to a particular drug point) that "there was internal friction between us" La Rompe members.[8]  Questioned about "what that internal war consisted of," Calviño-Acevedo explained that "the internal war was that there were rumors" that La Rompe members had murdered Pekeke.

Laureano-Salgado and Ramírez-Rivera's new-trial filings argued that these pieces of "recently disclosed evidence" show that La Rompe — and *not La ONU* — had murdered Pekeke to further the personal interests of La Rompe members, which they said "undermines confidence in the [j]ury VICAR verdict in this case."

---

[7] This La Rompe trial involved these defendants:  Rubén Cotto-Andio, José D. Resto-Figueroa, and Carlos Velázquez-Fontánez.

[8] This La Rompe trial involved these defendants:  Pedro Vigió Aponte, Reinaldo Rodríguez Martínez, Víctor M. Rodríguez Torres, Tarsis Guillermo Sánchez Mora, and Carlos M. Guerrero Castro.

Opposing the motion, the government protested that Laureano-Salgado and Ramírez-Rivera could not show that these statements would probably lead to an acquittal at a retrial because the evidence did not come from witnesses with firsthand knowledge of "the planning and execution" of Pekeke's murder.

Applying an actual-probability-of-acquittal standard,[9] the judge denied the motion for three alternative reasons: first that the statements "would likely not outweigh the eye-witness testimony" given at Laureano-Salgado and Ramírez-Rivera's "original trial by three of [their] fellow La ONU members"; second that the statements had very "limited probative" worth because they were "too unclear (and seemingly inconsistent)," which undercut Yanyoré-Pizarro's "credibility" as well; and third that even if the statements "could be construed as providing a convincing and consistent narrative . . . of Pekeke's murder," they would probably not be admissible at a retrial because they were not made on personal knowledge and violated the rule against hearsay. The judge did specifically note that Yanyoré-Pizarro "would be permitted to testify regarding certain internal conflicts within La Rompe . . . of which he has personal knowledge,

---

[9] Which is the standard applied to "most" new-trial motions bottomed on newly-discovered evidence (more on this later). United States v. Maldonado-Rivera, 489 F.3d 60, 66 (1st Cir. 2007).

including some that involved Pekeke." But according to the judge, "this, without more, is insufficient to justify" granting the new-trial motion.

## Principal Appellate Arguments

That brings us to today, with Laureano-Salgado and Ramírez-Rivera mounting a multifaceted challenge to the judge's new-trial ruling. Their lead claim is that the government's nondisclosure of these statements, which it had in its hands while their case was on appeal here, violated the guarantees set out in Brady v. Maryland, 373 U.S. 83 (1963), and its offspring — guarantees that require prosecutors to reveal material, exculpatory and impeaching evidence, see Maldonado-Rivera, 489 F.3d at 66-67 (discussing the Brady line of cases). Consistent with this Brady-based theory, they then argue that they need only show that the statements undermine confidence in the original verdict, not that the statements would probably lead to a different outcome at retrial. And they insist that they can meet the undermine-confidence standard because the statements counter the government's theory that La ONU iced Pekeke, at least as they see it.[10]

_____

[10] We can make quick work of two of their other arguments:

One argument blasts the judge for denying their new-trial motion without an evidentiary hearing. "[E]videntiary hearings on new trial motions in criminal cases are the exception rather than

- 11 -

As a fallback, Laureano-Salgado alone argues that he can satisfy "the more onerous" actual-probability-of-acquittal standard because of the statement's exculpatory value.[11]   And by

the rule."  United States v. Peake, 874 F.3d 65, 72 (1st Cir. 2017) (quoting United States v. Connolly, 504 F.3d 206, 220 (1st Cir. 2007)).   Yet — as the government notes, without correction — Laureano-Salgado and Ramírez-Rivera never asked the judge for an evidentiary hearing, which "ordinarily spells defeat for a contention that one should have been held."  See United States v. Cyr, 337 F.3d 96, 101 n.5 (1st Cir. 2003) (quoting United States v. Tardiff, 969 F.2d 1283, 1286 (1st Cir. 1992)).  And they make no developed argument for why the ordinary rule should not apply here.

The other argument accuses prosecutors of misconduct by presenting perjured testimony at their trial — the theory being that Yanyoré-Pizarro's and Calviño-Acevedo's statements show that Figueroa-Cancel, Gutiérrez-Santana, and Figueroa-Viera lied when they blamed La ONU — and La ONU members Laureano-Salgado and Ramírez-Rivera — for Pekeke's murder.  But this argument is twice waived:  first because Laureano-Salgado and Ramírez-Rivera did not present it below, see McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) (explaining the baseline rule "that theories not raised squarely in the district court cannot be surfaced for the first time on appeal"); and second because, while they toss around words like "perjury" and "misconduct" here, they "provide[] neither the necessary caselaw nor reasoned analysis to show that [they are] right about any of this," see Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (adding that "[j]udges are not mind-readers, so parties must spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority"); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (stressing that "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work").

[11] Ramírez-Rivera's brief mentions the "more stringent test" too, but only in *passing*:  not only does he fail to list the test's elements, he — as the government notes, without contradiction — makes zero attempt to apply that standard to his situation.  True, he did move below to adopt Laureano-Salgado's arguments.  But he did nothing here to adopt Laureano-Salgado's opening-brief

Laureano-Salgado's reckoning, Yanyoré-Pizarro's statements are "very favorable to [his] defense," given how they detail "confrontations and problems Pekeke had with other La Rompe . . . leaders" — thus indicating "a motive for his killing." Taking aim at the judge's credibility finding, Laureano-Salgado also claims that no law-enforcement personnel testified that Yanyoré-Pizarro's statements were "false" or "contradicted by other evidence." He then says that the judge stumbled by deeming Yanyoré-Pizarro's statements inadmissible — in his telling these "statement[s] are fully admissible" under the following theories: "as rebuttal evidence"; "as a constitutional matter," since "an accused has a

---

arguments. See, e.g., Ramírez-Rivera, 800 F.3d at 11 n.1 (discussing how appellants prosecuting consolidated appeals may adopt each other's arguments).

True too, Ramírez-Rivera moved here for leave to adopt the arguments presented in Laureano-Salgado's *reply* brief (in lieu of filing his own reply brief). And Laureano-Salgado's reply rehashed arguments he made in his initial brief — *i.e.*, that he can satisfy both the Brady-new-trial standard and the ordinary-new-trial standard. Taking up Ramírez-Rivera's motion, we wrote that "leave of court is not required for adoption" but warned that he ran the risk that we might find Laureano-Salgado's reply-brief arguments "not transferable or waived." Regrettably for Ramírez-Rivera, he gets no help from Laureano-Salgado's reply brief, and for a simple reason: Ramírez-Rivera did not adequately develop in his opening brief any argument tied to the ordinary-new-trial standard, and he cannot use a reply brief to cure that deficiency. See generally Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990) (holding that arguments not made in an opening brief but only in a reply brief are waived).

constitutional right to present a complete defense to all charges" laid "against him or her"; and "as statements against interest," since the "statements implicated" Yanyoré-Pizarro in Pekeke's murder. Leaving no stone unturned, Laureano-Salgado adds that the judge's inadmissibility ruling conflicts with the judge's later decision to let Yanyoré-Pizarro testify at the retrial of a La ONU codefendant named Ismael Cruz-Ramos — a decision that provides "the best argument" for why the "statements are fully admissible," at least in Laureano-Salgado's mind.[12] Ever-persistent, Laureano-Salgado argues as well that Calviño-Acevedo's testimony

---

[12] The retrial occurred a few months *after* denying Laureano-Salgado and Ramírez-Rivera's new-trial motion. Here is what we know about what went down (unfortunately, we do not have the compete transcripts). After a few days of trial, Cruz-Ramos's lawyer told the government that he had one defense witness, Yanyoré-Pizarro. On the next trial day (with the judge's permission), Cruz-Ramos's lawyer later made an extended offer of proof — via a *voir-dire* examination of Yanyoré-Pizarro (outside the jury's presence) — concerning the admissibility of Yanyoré-Pizarro's testimony. During that process, Yanyoré-Pizarro admitted that he was not present when Pekeke got killed. But he claimed that he heard from a fellow La Rompe member that Joshua had "pulled the trigger." He then explained that La Rompe must have had something to do with the murder, given the beef between Pekeke and Frank. But he also stressed that Frank worked with *La ONU* to kill Pekeke, saying (italics ours) that "it was *La ONU* who went in and did the job." Ultimately, the judge thought Yanyoré-Pizarro's testimony might fit within the coconspirator exception to the hearsay rule. "So," the judge said, "I'm not sure the opinion is actually impermissible, if he lays a foundation for it" (notice how the ruling is stated in the conditional) — though, Cruz-Ramos chose *not* to call Yanyoré-Pizarro as a witness (there's no suggestion that the government called Yanyoré-Pizarro to the stand).

"corroborate[s]" Yanyoré-Pizarro's narrative (that's the extent of what he has to say about Calviño-Acevedo, however). Putting it all together, he contends that the newly-discovered evidence would probably lead to an acquittal on the VICAR-related counts if there were a new trial.

Defending the judge's ruling to the hilt, the government argues that the actual-probability-of-acquittal standard governs because the "new evidence" arose post-conviction. And in its view, the judge hardly erred in finding that standard not met here, because Yanyoré-Pizarro and Calviño-Acevedo had no personal knowledge of who killed Pekeke, but channeled hearsay instead; also because the statements were too speculative since Yanyoré-Pizarro accused many persons of possibly being behind Pekeke's murder; and finally because the statements corroborated key facts presented by prosecutors at trial (*e.g.*, that Joshua shot Pekeke).

### Our Take[13]

*Dueling Legal Standards*

To get a new trial based on newly-discovered evidence, a defendant ordinarily must show that the evidence (1) was either

---

[13] A defendant must file a new-trial motion based on newly-discovered evidence within three years of the verdict or finding of guilt. See Fed. R. Crim. P. 33(b)(1). Laureano-Salgado and Ramírez-Rivera filed their motion outside that time restriction. But the government did not raise a timeliness objection below. And it expressly chose not to press one in its appellate briefing. So we say no more about that subject. See United States v. Del-

- 15 -

unknown or unavailable to him during the trial; (2) could not have been uncovered sooner with diligence; (3) is material, not just cumulative or impeaching; and (4) is sufficiently compelling that it would probably produce an acquittal at a retrial — a hefty burden, to be sure.  See, e.g., Peake, 874 F.3d at 69; United States v. Flores-Rivera, 787 F.3d 1, 15 (1st Cir. 2015); Del-Valle, 566 F.3d at 38; Maldonado-Rivera, 489 F.3d at 65-66.  We hedge with "ordinarily" because if the defendant bases his new-trial motion on an alleged Brady violation, a more defendant-friendly standard takes center stage:  he must still satisfy the first and second elements (unavailability and due diligence), but caselaw replaces the third and fourth elements (materiality and prejudice) with a

> unitary requirement that the defendant need demonstrate only a *reasonable probability* that, had the evidence been disclosed to the defense in a timely manner, the result of the proceeding would have been different.

Peake, 874 F.3d at 69 (emphasis added and quotation marks omitted).

So rather than having to show "'*actual* probability that the result

---

Valle, 566 F.3d 31, 38 (1st Cir. 2009) (suggesting that the Rule 33(b)(1) time-bar "is non-jurisdictional and may be forfeited" (citing Eberhart v. United States, 546 U.S. 12, 19 (2005) (per curiam))); see generally United States v. Alverio-Meléndez, 640 F.3d 412, 423 n.6 (1st Cir. 2011) (noting that because we could resolve the defendant's new-trial argument "on the merits and in favor of the government," we had no need to decide whether his new-trial "motion was untimely").

would have differed,'" a defendant need show only "something sufficient to 'undermine[] confidence'" in the jury's verdict. See United States v. Mathur, 624 F.3d 498, 504 (1st Cir. 2010) (emphasis and alteration in original) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)); accord Flores-Rivera, 787 F.3d at 15-16; see also United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993) (explaining that the "'undermine confidence' formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal").

Under either scenario, we will reverse a judge's new-trial denial only for an abuse of discretion. See, e.g., Connolly, 504 F.3d at 211-12. And we will find an abuse of discretion only when no reasonable person could agree with the judge's decision. See, e.g., United States v. Jones, 748 F.3d 64, 69 (1st Cir. 2014). This is as it should be. After all, the judge had a box-seat view of the trial, making him intimately familiar with the case's nuances — which justifies our giving his opinion on "the likely impact of newly disclosed evidence . . . *considerable deference*." See Mathur, 624 F.3d at 504 (emphasis added). We also keep in mind that the new-trial remedy "must be used sparingly, and only where a miscarriage of justice would otherwise result." United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001).

We shift now from the general to the specific.

*Governing Legal Standard*

Laureano-Salgado and Ramírez-Rivera contend that a Brady violation occurred because the government acquired the "new evidence" while their case was here on appeal yet failed to disclose that evidence at that time.[14]  Ergo, they say, the judge should have applied the more lenient Brady-based standard in analyzing their new-trial motion.  But they cite no controlling case holding that Brady obligations apply to evidence the government acquired post-verdict.  That is probably because binding precedent holds that where, as here, the record contains no indication that the government knew about these statements "at any time prior to or during [their] trial," Brady does not operate and so the more arduous ordinary new-trial standard controls.  See Maldonado-Rivera, 489 F.3d at 67; see generally Dist. Attorney's Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 67-69 (2009) ["Osborne"] (noting that Brady requires disclosure only

---

[14] No one disputes that the government learned about the statements spotlighted in appellants' new-trial motion *after* the verdict in their case:  Laureano-Salgado and Ramírez-Rivera's trial ended in February 2013; Yanyoré-Pizarro's grand-jury testimony occurred in May 2015, his ATF interviews went down in January 2016, and his trial testimony happened in October 2016; and Calviño-Acevedo's trial testimony happened in December 2015. And because the Ramírez-Rivera decision came down in August 2015, only Yanyoré-Pizarro's May 2015 grand-jury testimony fits into their discovered-while-the-case-is-on-direct-appeal category.

- 18 -

of exculpatory and impeaching info that existed at the time of the original trial, emphasizing that "Brady is the *wrong* framework" for evaluating the government's post-trial disclosure obligations); accord Tevlin v. Spencer, 621 F.3d 59, 69-70 (1st Cir. 2010); see generally Skinner v. Switzer, 562 U.S. 521, 536 (2011) (commenting that "Brady announced a constitutional requirement addressed first and foremost to the prosecution's conduct pretrial").

Tellingly, neither Laureano-Salgado nor Ramírez-Rivera attempts to distinguish Maldonado-Rivera. Ramírez-Rivera tries to distinguish Osborne and Tevlin as situations involving *habeas* proceedings, while his involves a direct appeal — to quote his brief: "A direct appeal is not a postconviction proceeding," the implication being that neither Osborne nor Tevlin controls his case. And Laureano-Salgado tries to distinguish Tevlin on that basis too (his brief says nothing about Osborne). But they offer no persuasive reasoning or authority to support their *habeas*-is-not-a-postconviction contention. Maybe a good argument exists that might help them. But because their suggestion is not sufficiently developed to permit us to pass on it intelligently, we consider it waived and leave its resolution for another day. See, e.g., Patton v. Johnson, 915 F.3d 827, 838 (1st Cir. 2019).

Perhaps hoping to scare us into action, Laureano-Salgado contends that the government believes that prosecutors do not have "even an ethical" duty "to reveal material information known to [them] after a guilty verdict, but before the appeal is concluded, because the evidence was not in existence at the time of trial." The government says no such thing, however. Actually, the government candidly acknowledges that "after a conviction the prosecutor . . . is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction." Imbler v. Pachtman, 424 U.S. 409, 427 n.25 (1976) (going on to hold that prosecutorial immunity applies even where a prosecutor commits a Brady infraction because, among other reasons, "[t]he possibility of personal liability" might make prosecutors unwilling to comply with this ethical duty). And Laureano-Salgado makes no Imbler-based argument, even after the government pointed out that "[b]ecause none of the information relevant here casts doubt on [their] convictions, the prosecutors . . . had no occasion to disclose it" before their "request" (though we imply no view about whether any such argument would be tenable).

*No Abused Discretion*

Laureano-Salgado's fallback argument — that he deserves a new trial even under the ordinary standard and that the judge

slipped in concluding otherwise — fails because he did not meet his heavy burden of showing that the impact of the statements he champions is so strong that a fresh jury (apprised of their content) would probably vote to acquit him on the VICAR-related charges. See United States v. Vigneau, 337 F.3d 62, 69 (1st Cir. 2003) (noting that satisfying this part of the ordinary test is no easy feat because, among other things, we must give the district judge's views "considerable deference" (quoting United States v. Falú-González, 205 F.3d 436, 443 (1st Cir. 2000)); see also United States v. Hernández-Rodríguez, 443 F.3d 138, 143 (1st Cir. 2006) (declaring that "we have no discretion to grant a motion for new trial if any one of the four factors [in the ordinary test] is lacking").[15] We explain.

Both sides spend a lot of time sparring over whether the at-issue evidence presents admissibility or credibility problems. But let's assume — without deciding, of course — that Laureano-Salgado is right that neither problem lurks here. Even so, he is not entirely out of the woods.

The actual-probability-of-acquittal standard requires "an evaluation of the new evidence in juxtaposition to the evidence

---

[15] We focus on Laureano-Salgado's contentions because (as we noted earlier) Ramírez-Rivera waived any arguments based on the ordinary standard that he might have had.

- 21 -

actually admitted at trial."  United States v. Josleyn, 206 F.3d 144, 157 (1st Cir. 2000).  Here, the new statements corroborate many of the key facts established at trial — like how Joshua lived with his grandmother in the same housing project as Pekeke and how Joshua shot Pekeke.  The statements also show that Yanyoré-Pizarro basically suggested that *different persons* had *different motives* for killing Pekeke:  (a) La Rompe's Trenza and Papito Mojica, apparently to take over Pekeke's drug points; (b) La Rompe bosses at the Alturas de Cupey housing project, supposedly because Pekeke had refused their help request; (c) La Rompe's Frank, apparently because Frank and Pekeke could not agree on who was "the boss" — in his last version of this narrative, Yanyoré-Pizarro had Frank working with *La ONU* to gun down Pekeke; and (d) gangbangers from the Luis Llorén Torres housing project, supposedly because Pekeke had orchestrated their leader's murder.  At any new trial the jury would weigh Yanyoré-Pizarro's shifting stories against Figueroa-Cancel's, Gutiérrez-Santana's, and Figueroa-Viera's consistent testimony implicating Laureano-Salgado and Ramírez-Rivera in Pekeke's slaying.  And the jury would also weigh (on the one hand) the absence of evidence indicating that Yanyoré-Pizarro was present when La Rompe (allegedly) planned Pekeke's murder, and (on the other hand) the existence of evidence showing that Figueroa-Cancel, Gutiérrez-Santana, and Figueroa-Viera were present when La

ONU plotted Pekeke's demise and that they — along with Laureano-Salgado and Ramírez-Rivera — helped La ONU take Pekeke out.

Having performed the requisite evidentiary comparison, we agree with the district judge that the statements are not "sufficiently compelling" as to generate a realistic probability of an acquittal on the VICAR-related counts. See United States v. Alicea, 205 F.3d 480, 487 (1st Cir. 2000). And because this evidence does not "preponderate[]" so "heavily" against the jury's verdict that it would be a miscarriage of justice to let the convictions on the VICAR-related counts stand, we cannot fault the judge for denying the new-trial motion. See United States v. George, 448 F.3d 96, 102 (1st Cir. 2006) (quoting United States v. Villarman-Oviedo, 325 F.3d 1, 15 (1st Cir. 2003)).

As a parting shot, Laureano-Salgado contends that United States v. Hernández-Rodríguez, 443 F.3d 138 (1st Cir. 2006) — where we reversed a district court's new-trial denial — should compel us to reverse here. But Hernández-Rodríguez does not aid his cause. Here is why.

A jury convicted José Ramón Hernández-Rodriguez ("Hernández") and Douglas Gorbea Del-Valle ("Gorbea") of various drug crimes. Id. at 140. Gorbea ran a trading company that imported a cocaine shipment from Venezuela to Puerto Rico. Del-Valle, 566 F.3d at 33. He also handled many of the operation's

- 23 -

details. Id. Hernández owned the trucking company that Gorbea used to move the shipment from the docks to a nearby truck yard. Hernández-Rodríguez, 443 F.3d at 141. To prove that Hernández knowingly participated in the scheme, the government relied on a fax found in Gorbea's briefcase — a fax that had the name "José Hernández" written on it. Id.

Sometime after his conviction, Hernández sought a new trial based on newly-discovered evidence contained in an affidavit by Gorbea saying that he (Gorbea) did not know Hernández personally. Id. A magistrate judge held an evidentiary hearing, at which Gorbea testified that the "José Hernández" on the fax referred not to his codefendant but to another person with the same name. Id. at 142. Finding Gorbea credible, the magistrate judge recommended that the district judge grant Hernández a new trial. See id. at 140, 146. Without holding a further evidentiary hearing, the district judge rejected the magistrate judge's recommendation. Id. After assuming without deciding that the supposed new evidence was credible, the district judge ruled that a reasonable jury could still infer Hernández's knowing participation from other circumstantial evidence, like his tailing the van with the cocaine as it left the docks. Id. at 146. Over a dissent, a panel of this court reversed, holding in relevant part that the evidence, "if deemed credible by a jury, . . . would

greatly undermine the conspiracy charges against Hernández" (given the government's theory of prosecution) and thus "the district court abused its discretion by failing to consider the full import of [Hernández's] new evidence" after "assum[ing], *arguendo*, Gorbea's credibility." Id. at 146, 148.

Unfortunately for Laureano-Salgado, the difference between Hernández-Rodríguez and his case is one of night and day. As we just said, the evidence there (if believed) "would greatly undermine" the charges against the defendant. But as we also just explained, the evidence here (even if believed) would not have that same effect — given the equivocal nature of Yanyoré-Pizarro's testimony, and how his testimony rested solely on rumors and did (at times) implicate La ONU in Pekeke's death. So Hernández-Rodríguez is no help to Laureano-Salgado.

Undaunted, Laureano-Salgado argues that his "new evidence . . . is stronger than the [new evidence] in Hernández-Rodríguez as the government [here] relied upon it in not one, but two subsequent [La Rompe] trials" — the first involving Yanyoré-Pizarro's testimony (see footnote 7 and the text to which it is appended); the second involving Calviño-Acevedo's testimony (see footnote 8 and the text to which it is appended). But this argument is not a game-changer either because, again, here — unlike in Hernández-Rodríguez — the alleged new evidence cannot be

- 25 -

reasonably viewed as "greatly undermin[ing]" the pertinent verdicts. And to the extent he believes Calviño-Acevedo's testimony saves the day by (supposedly) corroborating Yanyoré-Pizarro's testimony, he is mistaken. That is because Calviño-Acevedo's testimony highlights how Yanyoré-Pizarro's testimony rested on rumors that cannot (for reasons already detailed) help Laureano-Salgado satisfy the actual-probability-of-acquittal component of the ordinary new-trial standard.

*Long and Short of It*

Experience shows that a supposedly new "piece of evidence often looms larger in the eyes of a hopeful defendant than its actual dimensions warrant." Peake, 874 F.3d at 72. So it is here. Ultimately, having considered the parties' arguments with care, we conclude that the judge applied the correct legal standard and abused no discretion in denying the new-trial motion.[16]

**Final Words**

All that is left to say then is: *Affirmed*.

---

[16] For what it may be worth, we note that even if we were willing to overlook Ramírez-Rivera's waiver of arguments keyed to the actual-probability-of-acquittal standard — and we most certainly are not — he too would lose for the reasons just given.